UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEBSEED, INC., et al.,<br>Plaintiffs,<br>v.<br>DEPARTMENT OF STATE, et al.,<br>Defendants. | Case No. 25-cv-03020-AMO<br><br>**ORDER RE MOTIONS TO DISMISS**<br>Re: Dkt. Nos. 126, 127, 128, 129, 130 |
| CANCER STEP OUTSIDE THE BOX, LLC, et al.,<br>Plaintiffs,<br>v.<br>DEPARTMENT OF STATE, et al.,<br>Defendants. | Case No. 25-cv-07399-AMO<br><br>**ORDER RE MOTIONS TO DISMISS**<br>Re: Dkt. Nos. 125, 126, 127, 128, 133 |

Before the Court are several motions to dismiss from Defendants in these two related cases. The motions were heard together on September 2, 2026. At the hearing, the parties agreed that resolution of the motions across both cases could be resolved through a single order – this is that order. Having read the papers filed by the parties and carefully considered their arguments therein and those made at the hearing, as well as the relevant legal authority, the Court **GRANTS** the motions to dismiss for the following reasons.

## I. BACKGROUND

Plaintiffs Webseed, Inc., and Brighteon Media, Inc., present a 296-paragraph, 91-page Amended Complaint through which they seek to hold some nine private corporations and government agencies liable under a complex web of constitutional, statutory, and common-law theories of liability for their respective roles in the restriction of access to Plaintiffs' app, website,

United States District Court
Northern District of California

and online posts. *Webseed, Inc., et al. v. Dept. of State et al.*, Case No. 25-cv-03020-AMO ("*Webseed*"), Dkt. No. 4 ("FAC"). Plaintiffs Cancer Step Outside the Box ("CSOTB"), Ty Bollinger, and Charlene Bollinger advance an 834-paragraph, 317-page Amended Complaint that similarly seeks to hold largely the same Defendants liable on a nearly identical theory. *See Cancer Step Outside the Box et al. v. Dept. of State et al.*, Case No. 25-cv-07399-AMO ("*CSOTB*"), Dkt. No. 7 ("FAC").

### A. Factual Background[1]

The Plaintiffs in *Webseed* allege they have operated websites such as NaturalNews.com, Brighteon.com, and HealthRanger.com that discuss "human rights issues," "ways to optimize health," and " 'controversial' life issues" and which have "reached millions of readers." *Webseed*, FAC ¶¶ 12-14, 20, Exs. A-B. They also allege they "actively endorse / promote, among other things, holistic approaches to bettering one's health that are contrary to the [federal] Government's COVID vaccine 'mandates.' " *Id.* ¶ 48. The Plaintiffs in CSOTB own TTAC Publishing, LLC (with "TTAC" an initialism for "The Truth About Cancer") and TTAV Global, LLC (with "TTAV" an initialism for "The Truth About Vaccines"). *CSOTB*, FAC ¶ 357. Plaintiffs have used these businesses to disseminate their "viewpoints on COVID" which "do not adhere to those of the [federal] Government," including by posting "'vaccine-hesitant' content" regarding the "fake pandemic." *Id.* ¶¶ 22, 380, 668 (brackets omitted).

According to Plaintiffs in both cases, the federal government tried to "eradicate" them from social media platforms to "silence" Plaintiffs' "COVID-related speech involving viewpoints that do not square with those of the Government." *Webseed*, FAC ¶ 2. To do this, the federal agencies of the Department of State, Global Engagement Center, Department of Defense, and Department of Homeland Security (collectively, "Government Defendants") funded and developed "private censorship enterprises and their associated censorship technology / 'tools.' " *Id.* ¶ 39; *see id.* at 2 n.4. The "censorship enterprises" in the *Webseed* case include (1) NewsGuard

[1] For purposes of the motions under consideration, the Court accepts Plaintiffs' well-pleaded factual allegations as true and draws all reasonable inferences in the Plaintiffs' favor. *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1158 (9th Cir. 2024); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014)

United States District Court
Northern District of California

Technologies, which developed the NewsGuard "rating system for news and information websites" (*id.* ¶ 40); (2) the Institute for Strategic Dialogue ("ISD"), which provides analysis and "advocate[s] policy solutions" to governments worldwide (*id.* ¶ 41); and (3) the Global Disinformation Index ("GDI"), which provides data to "policymakers and business leaders about how to combat disinformation" (*id.* ¶ 42), all of which are non-governmental organizations (*id.* ¶¶ 29-31). NewsGuard Technologies, ISD, and GDI each "peg Plaintiffs as sources of misinformation." *Id.* ¶ 46. Similarly, the "censorship enterprises" in the *CSOTB* case include (1) Center for Countering Digital Hate, Inc. ("CCDH"), (2) Media Matters for America ("MMA"), and (3) Center for Internet Security ("CIS") engaged in similar conduct tending toward censorship. *See CSOTB*, FAC ¶ 25.[2] For example, CCDH published a report titled *The Disinformation Dozen* on March 24, 2021, which identified *CSOTB* Plaintiffs Ty and Charlene Bollinger among twelve individuals who were responsible for nearly two-thirds of anti-vaccine content circulating on social media platforms. *CSOTB*, FAC ¶ 168. On April 28, 2021, CCDH published an additional report, *Disinformation Dozen: The Sequel*, which found that "one month after tech CEOs vowed at a Congressional hearing to crack down on the twelve main 'superspreaders' of vaccine disinformation, this 'Disinformation Dozen' is continuing to operate across Facebook, Twitter, and Instagram" and that "[f]alse and misleading content produced by the 12 individuals and their organisations was viewed up to 29 million times in the past month." The sequel report again identified the Bollingers as part of the group of twelve responsible for approximately 65% of anti-vaccine content circulating on social media. *Id.* ¶ 405. Plaintiffs aver that CCDH "discriminatorily labeled Plaintiffs as purported sources of misinformation, disinformation, or malinformation." *Id.* ¶ 151.

The Government Defendants "coerc[ed]" and "guid[ed]" X Corp., as well as Meta Platforms, Inc., and Google LLC (collectively, the "Platform Defendants") into using the NGO

[2] For purposes of this Order, NewsGuard Technologies, ISD, GDI, CCDH, MMA and CIS are referred to collectively as "NGO Defendants." However, of these, only CCDH remains active in the *CSOTB* case. Defendants ISD and GDI only recently appeared in the *Webseed* case. *See Webseed*, Dkt. Nos. 183, 187. GDI's motion to dismiss, Dkt. No. 186, not yet fully briefed, is not resolved in this Order.

Defendants' tools to "blacklist" Plaintiffs and "remove and reduce (i.e., censor) Plaintiffs' ability to speak freely" and "advertise [their] products" on the Platform Defendants' social media platforms. *Webseed*, FAC ¶ 116; *see also id.* ¶ 50. Beginning in 2015, online platforms, such as Google and Facebook, began restricting Plaintiffs' content. *Webseed*, FAC ¶¶ 15-16, 82. Google delisted NaturalNews.com and removed the NaturalNews app from Google Play, while Facebook banned NaturalNews from its platform "for spammy and abusive behavior." *Id.* ¶¶ 15, 82. Plaintiffs contend the Platform Defendants' moderation of their content on the social media platforms caused Plaintiffs to suffer a loss of "advertising revenue / web trafficking monies" and "reduc[ed] the circulation of Plaintiffs' reporting and speech." *Id.* ¶ 45.

*Webseed* asserts twelve claims:

- (1) "abridgment" of Plaintiffs' right to freedom of speech, against all Defendants;
- (2) "abridgment" of Plaintiffs' right to freedom of the press, against all Defendants;
- (3) "ultra vires non-final agency action," against the Government only;
- (4) "unlawful final agency action," against the Government only;
- (5) "ultra vires action beyond constitutional bounds," against the Government only;
- (6) violation of the Texas Free Enterprise and Antitrust Act of 1983, Tex. Stats. § 15.05(a) and (b), against the NGO Defendants and the Platform Defendants;
- (7) violation of the Texas Discourse on Social Media Platforms, Tex. Stats. §§ 143A.001-143A.008, against the NGO Defendants and the Platform Defendants;
- (8) negligence, against the NGO Defendants and the Platform Defendants;
- (9) tortious interference with business relations and prospective economic advantage, against the NGO Defendants and the Platform Defendants;
- (10) negligent misrepresentation, against the Platform Defendants;
- (11) fraud, against the Platform Defendants; and
- (12) promissory estoppel, against the Platform Defendants.

*Webseed*, FAC ¶¶ 210-95. Plaintiffs request injunctive relief and damages of "more than $25,000,000.00." *Id.* ¶¶ 251, 271, 275, 279, 284, 289, 295.

United States District Court
Northern District of California

*CSOTB* asserts 17 claims, styled as:

- (1) "abridgment" of Plaintiffs' right to freedom of speech, against all Defendants;
- (2) "abridgment" of Plaintiffs' right to freedom of the press, against all Defendants;
- (3) "ultra vires non-final agency action," against the Government;
- (4) "unlawful final agency action," against the Government;
- (5) "ultra vires action beyond constitutional bounds," against the Government;
- (6) "abridgment" of Plaintiffs' right to privacy, against the Government;
- (7) civil conspiracy, against all Defendants;
- (8) violation of the Tennessee Trade Practices Act, Tenn. Code § 47-25-101, against the NGO Defendants and Platform Defendants;
- (9) negligence, against the NGO Defendants and Platform Defendants;
- (10) tortious interference with business or economic relationships, against the NGO Defendants and Platform Defendants;
- (11) negligent misrepresentation, against the Platform Defendants;
- (12) negligent design, against the Platform Defendants;
- (13) fraud, against the Platform Defendants;
- (14) promissory estoppel, against the Platform Defendants;
- (15) "practicing medicine without a valid license," against the Platform Defendants;
- (16) "treason," against the Government; and
- (17) revocation of "501(c)(3) tax-exempt status," against the NGO Defendants.

*CSOTB*, FAC at 4, ¶¶ 711-833. Plaintiffs request damages, injunctive relief, and "jail time." *Id.* ¶¶ 715, 720, 739, 745, 752, 761, 768, 769, 778, 782, 786, 790, 797, 802, 808, 816, 822, 833.

**B. Relevant Procedural History**

On May 27, 2024, Plaintiffs initiated the *Webseed* lawsuit in the Western District of Texas. *Webseed*, Dkt. No. 1. About a month later, Plaintiffs filed the operative FAC. *Webseed*, Dkt. No. 4. The Court granted the Platform Defendants' motions to transfer the case to this District. *Webseed*, Dkt. Nos. 56, 59, 60. Once here in the Northern District of California, Defendants filed

United States District Court
Northern District of California

the instant motions to dismiss. *Webseed*, Dkt. Nos. 127 (Google), 128 (Meta), 129 (Government Defendants), 130 (X Corp.). After requesting and receiving three extensions of time, *Webseed*, Dkt. Nos. 133, 135, 137, Plaintiffs filed a motion to re-transfer the case to the Western District of Texas based on the "structural infirmity" of the Ninth Circuit Court of Appeals and its district courts, *Webseed*, Dkt. No. 138, as well as a "motion to compel the acutely germane Attorney General federal censorship report," *Webseed*, Dkt. No. 139. Complete briefing followed on all of Defendants' motions to dismiss as well as Plaintiffs' pair of motions. In the days leading up to the hearing for all the motions, Plaintiffs withdrew the motion to re-transfer, *Webseed*, Dkt. No. 171, and voluntarily dismissed Defendant NewsGuard, *Webseed*, Dkt. No. 172.

The *CSOTB* case followed a similar procedural course. On December 16, 2024, Plaintiffs initiated this suit in the Middle District of Tennessee. *CSOTB*, Dkt. No. 1. On January 23, 2025, Plaintiffs filed the FAC. *CSOTB*, Dkt. No. 7. Plaintiffs voluntarily dismissed CIS on March 20, 2025, *CSOTB*, Dkt. No. 37, and voluntarily dismissed MMA on April 23, 2025, *CSOTB*, Dkt. No. 48. On September 2, 2025, the Middle District of Tennessee transferred this case to this Court. *CSOTB*, Dkt. Nos. 74, 75. Once here in the Northern District of California, Defendants filed their motions to dismiss. *CSOTB*, Dkt. Nos. 125 (Google), 126 (Meta), 127 (Government Defendants), 128 (X Corp.), 133 (CCDH). After requesting and receiving three extensions of time, *CSOTB*, Dkt. Nos. 130, 132, 135, Plaintiff filed a motion to re-transfer the case to the Middle District of Tennessee based on the "structural infirmity" of the Ninth Circuit Court of Appeals and its district courts, *CSOTB*, Dkt. No. 136, as well as a "motion to compel the acutely germane Attorney General federal censorship report" directed by an Executive Order, *CSOTB*, Dkt. No. 137. Complete briefing followed on all of Defendants' motions to dismiss and Plaintiffs' pair of motions. In the days leading up to the hearing for all the motions, Plaintiffs withdrew the motion to retransfer. *CSOTB*, Dkt. No. 171.

At the September 2, 2026 hearing on all the motions, the Court denied Plaintiffs' motions to compel the Attorney General report on the record. *Webseed*, Dkt. No. 173; *CSOTB*, Dkt. No.

172.[3] Accordingly, only Defendants' motions to dismiss remain outstanding for resolution after the September 2, 2026 hearing.

## II. DISCUSSION

As described above, there are four motions to dismiss pending in *Webseed* and five motions to dismiss pending in *CSOTB*. The legal and factual issues presented are so similar that Plaintiffs filed the same opposition briefs in both cases. *See, e.g.*, *Webseed*, Dkt. No. 148, and *CSOTB*, Dkt. No. 146 (identical briefs in opposition to Government Defendants' motions to dismiss). The Court thus takes up the pending motions together in the discussion that follows, noting where the analysis applies exclusively to one case. The Court begins with the threshold issues of standing and redressability, then turns to mootness, then turns to consider the remaining claims under Rule 12(b)(6). The Court concludes the discussion by identifying which claims as to which Defendants may be amended.

### A. Standing

Several Defendants aver that Plaintiffs lack standing to pursue all or part of their claims in this pair of cases. The Court evaluates challenges to Article III standing under Rule 12(b)(1), which governs motions to dismiss for lack of subject matter jurisdiction. *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011). Rule 12(b)(1) motions may be either facial, where the inquiry is confined to the allegations in the complaint, or factual, where the court is permitted to look beyond the complaint to extrinsic evidence. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). When a defendant challenges jurisdiction "facially," all material allegations in the complaint are assumed true, and the court determines whether the factual allegations are sufficient to invoke the court's subject matter jurisdiction. *Id.*

---

[3] The Court additionally ordered Plaintiffs' counsel, Jeffrey L. Greyber, to show cause why sanctions should not issue for his statements justifying his requested extensions. *See Webseed*, Dkt. No. 173; *CSOTB*, Dkt. No. 172. Plaintiffs' requests for extensions of time stated that additional time was necessary to prepare and align opposition briefs in response to the several motions to dismiss, but those statements appear inconsistent with subsequent filings – Plaintiff filed two noticed motions seeking alternative relief along with a 421-page "exhaustive case study" prior to filing his opposition briefs. *See, e.g.*, *Webseed*, Dkt. No. 138-1. The Court does not resolve that order to show cause in this Order.

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case – in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). To establish standing, "(1) the plaintiff [must have] suffered an injury in fact, i.e., one that is sufficiently 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,' (2) the injury is 'fairly traceable' to the challenged conduct, and (3) the injury is 'likely' to be 'redressed by a favorable decision.' " *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). As the Supreme Court has made clear, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press" against each defendant, "and for each form of relief that they seek." *TransUnion*, 594 U.S. at 431.

"[P]laintiffs must establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.' " *Maya*, 658 F.3d at 1070 (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). "[A] causation chain does not fail simply because it has several 'links,' provided those links are 'not hypothetical or tenuous' and remain 'plausib[le.]' " *Id.* (quoting *Nat'l Audubon Soc., Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002)). But "[w]here a chain of causation 'involves numerous third parties' whose 'independent decisions' collectively have a 'significant effect' on plaintiffs' injuries, the Supreme Court and [the Ninth Circuit] have found the causal chain too weak to support standing at the pleading stage." *Maya*, 658 F.3d at 1070 (citing *Allen*, 468 U.S. at 759). "A plaintiff's injury is 'fairly traceable' when there is a 'substantial likelihood' that the defendant's conduct caused the harm." *Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 878-79 (N.D. Cal. 2024) (quoting *NRDC v. Texaco Ref. & Mktg., Inc.*, 2 F.3d 493, 505 (3d Cir. 1993)). "[W]hat matters is not the 'length of the chain of causation,' but rather the 'plausibility of the links that comprise the chain.' " *Mendia v. Garcia*, 768 F.3d 1009, 1012-13 (9th Cir. 2014) (quoting *Nat'l Audubon Soc.*, 307 F.3d at 849).

Relevant here, the Supreme Court expressly considered standing issues in cases involving a plaintiff's claim that the federal government coerced social media companies into suppressing online speech – there, plaintiffs' content regarding the Covid-19 pandemic and the 2020 election.

United States District Court
Northern District of California

*See Murthy v. Missouri*, 603 U.S. 43, 58 (2024). The Supreme Court explained that to establish standing in such a case, "the plaintiffs must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Id.* at 58. In *Murthy*, the Court concluded that the plaintiffs had not established "specific causation" because they had failed to show "that a particular defendant pressured a particular platform to censor a particular topic before that platform suppressed a particular plaintiff's speech on that topic." *Id.* at 59-61. Assessing the asserted "direct censorship injuries" on a plaintiff-by-plaintiff, defendant-by-defendant, and platform-by-platform basis, the Court concluded that none of those plaintiffs had standing to claim that past injuries were traceable to the Government's conduct. *Id.* at 58-68. "And even where the plaintiff, platform, time, content, and defendant line up, the links must be evaluated in light of the platform's independent incentives to moderate content." *Id.* at 61; *see also id.* at 60 (acknowledging that evidence showed "the platforms had independent incentives to moderate content and often exercised their own judgment."). The Court found the plaintiffs failed to establish standing on both bases – (1) failure to trace their censorship injuries to the Government's conduct and (2) failure to attribute the social media platforms' content moderation to Government coercion considering their independent incentives to moderate their platforms. Beyond the causation analysis, the Court emphasized that plaintiffs in *Murthy* failed to show "a real and immediate threat of repeated injury," as required to obtain prospective relief. *Id.* at 58 (citation omitted). Thus, "without proof of an ongoing pressure campaign," the Court determined it was "entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Id.* at 69.

Here, Plaintiffs fail on both fronts – Plaintiffs fail to sufficiently allege causation that would render their censorship injuries traceable to the Government Defendants, and Plaintiffs fail to plausibly allege future injury. The Court analyzes each issue in turn.

//

//

United States District Court
Northern District of California

**1. Causation**

**a. "Lining up" allegations**

As *Murthy* explains, plaintiffs need to show on a plaintiff-by-plaintiff, defendant-by-defendant, and platform-by-platform basis, "specific causation" by each defendant of the alleged unlawful content moderation. *Murthy*, 603 U.S. at 59-61. Plaintiffs' failure to allege specific facts such that "[p]laintiff, platform, time, content, and defendant line up" with respect to any particular instance of content moderation is alone fatal to their assertion of standing. *Id.* at 61.

Here, Plaintiffs' allegations generally track the narrative underlying the *Murthy* litigation – Plaintiffs assert the Government coerced and supported efforts by third parties to monitor Covid-related content on social-media platforms. *See generally Webseed*, FAC ¶¶ 38-123. As in *Murthy*, Plaintiffs' primary theory of standing "involves their 'direct censorship injuries.' " *Id.*, 603 U.S. at 58. Plaintiffs assert that platforms' suppression of their speech is traceable to the Government Defendants and NGO defendants collectively funding and operationalizing censorship. *Webseed*, Dkt. No. 148 at 21; *cf. Murthy*, 603 U.S. at 58-59 ("They claim that the restrictions they have experienced in the past on various platforms are traceable to the defendants and that the platforms will continue to censor their speech at the behest of the defendants."). Yet just like the plaintiffs in *Murthy*, Plaintiffs here fail to sufficiently tether any specific instance of alleged content moderation to any particular act of any Federal Defendant. Instead, they put forth two sets of allegations.

First, they allege various interactions between the Government Defendants and two sets of third parties. The first set of third parties in the *Webseed* action, for example, are the NGO Defendants, including NewsGuard, ISD, and GDI. According to Plaintiffs, the Government Defendants funded/supported the third-party entities' efforts to "blacklist" speakers that expressed Covid-related speech contrary to the Government's speech. *See, e.g.*, *Webseed*, FAC ¶ 44 ("[T]he Government (e.g., DOS / GEC and DOD) has funded, promoted, and / or marketed to at least the American censorship enterprise that is NewsGuard Tech, and there is also evidence of Defendants' funding the foreign censorship enterprises that are ISD and GDI."); *id.* ¶ 49 ("[T]o ensure the public believed the only option was / is to accept the unknown / untested / unreliable Government-

United States District Court
Northern District of California

pushed COVID vaccinations . . . the Government acted to formulate the 'tools' (through the likes of NewsGuard Tech, ISD, and GDI)."); *id.* ¶ 77 ("GDI is . . . [a] Government-funded, Government-contracted, and Government-promoted blacklisting service"). The other set of third parties are the Platform Defendants. Plaintiffs allege that Government Defendants "coerced" these social-media platforms to censor Covid-related content. *See, e.g.*, *id.* ¶ 51 ("NewsGuard, ISD, GDI[] are . . . utilized by Big Tech (e.g., Facebook, Google, Twitter) at the Government's pressuring to 'rationalize' / justify the Big Tech censorship / de-platforming scheme that unfolds"); ¶ 2 n.7 ("because [a non-Plaintiff's] COVID-19 viewpoints contradicted those of the Government . . . the Government's Instruments (e.g., Twitter) were obliged to censor [the non-Plaintiff] at the Government's behest").

Second, Plaintiffs allege that the NGO Defendants and Platform Defendants (together, the third parties) targeted Plaintiffs' Covid-related content. *See, e.g.*, *Webseed*, FAC ¶ 46 (alleging that NewsGuard, ISD, and GDI would "discriminatorily peg Plaintiffs as sources of misinformation or malinformation (among other things)" and that these characterizations would then be used by social-media platforms such as Facebook to censor Plaintiffs' speech).

These allegations are insufficient to establish Plaintiffs' standing. At the threshold, the vast majority of these allegations fail as merely conclusory. Plaintiffs, for example, repeatedly complain of Government "coercion" of social-media platforms without identifying any instances of interactions between the Government and the social-media platforms. *See, e.g.*, *id.* ¶ 5 (alleging in general terms that the Government "coerced (via exertion of extreme pressure and threat) Big Tech into the Government's desired censorship campaign (i.e., overt molding / manipulation of the modern public square"); *id.* ¶ 95 (alleging that the Government "pushe[d]" "censorship tools" "on (via immense coercion / pressure / threat) Big Tech to facilitate on Big Tech platforms" without alleging specifics). Plaintiffs' best attempt at alleging specifics is a reference to a November 2022 deposition transcript in another district court case stating that GEC interacted with certain social-media platforms regarding " 'countering disinformation.' " *Webseed*, FAC ¶¶ 71-72 (citing *Missouri v. Biden*, 680 F. Supp. 3d 630, 684 (W.D. La. 2023), *rev'd and remanded sub nom. Murthy*, 603 U.S. 43). Plaintiffs also repeatedly allege "censorship" by the

platforms in generic terms without identifying any specific post that was allegedly removed, the date of any such removal, or whether the content pertained to Covid-19 in the first place. *See, e.g.*, *Webseed*, FAC ¶ 50 (alleging "eradication of Plaintiffs on social media platforms such as Facebook, Google, and Twitter" without identifying specifics); *id.* ¶ 73 (alleging that "censorship tools and instruments . . . abridged Plaintiffs' First Amendment rights" without alleging any instance of censorship in particularized terms). But these and other allegations from Plaintiffs simply assume causation through conclusory statements. For example, Plaintiffs rely on nothing more than "information and belief" for the proposition that the alleged "blacklist[ing]" of Plaintiffs by NewsGuard occurred "at the Government's behest." *id.* ¶ 47; *see also id.* ¶ 51 ("Upon information and belief, along the lines of *Missouri v. Biden*, Big Tech is coerced (*via* relentless pressure under threat, such as losing its Government civil liability 'protections') by the Government into implementing the Government's censorship-oriented 'tools.' "); *id.* ¶ 73 ("Upon information and belief," certain "tools and techniques" of the GEC – as identified during discovery in *Missouri v. Biden* – "include censorship tools and instruments that abridged Plaintiffs' First Amendment rights"). These bare allegations fail as insufficient because they lack factual support. Without specific factual allegations, Plaintiffs' assertions reflect nothing more than "labels and conclusions," and therefore fail on their own terms. *Iqbal*, 556 U.S. at 678 (citation omitted).

Plaintiffs broadly complain about the Government's alleged "coercion" of social-media platforms, its alleged "support" of third-party platforms, and the third parties' alleged "censorship" of their content is general terms. Plaintiffs attempt to establish causation by repeating their two sets of disconnected allegations: (1) that the Government supported third-party platforms, which, in turn, labeled Plaintiffs as sources of misinformation; and (2) that the Platform Defendants censored Plaintiffs. According to Plaintiffs, these sets of facts show that "[t]he Government has affirmatively coerced social media platforms (e.g., Facebook, Google, Twitter) to censor lawful and legitimate (but disfavored) information of their own users (e.g., Plaintiffs)[.]" *Webseed*, Dkt. No. 148 at 18 (citation omitted). Yet Plaintiffs do not identify any facts connecting the dots between the Government and the other Defendants or, more broadly, to support their conclusion

United States District Court
Northern District of California

that the alleged censorship was caused by Government coercion. *Id.* For example, Plaintiffs cite an article that purports to identify awards of monies from the Government to NewsGuard in 2020 and 2021. *Webseed*, FAC ¶ 44 n.18 (citing Margot Cleveland, *NewsGuard Claims Not To Be Government-Funded, But A $750K Grant Suggests Otherwise*, THE FEDERALIST (Mar. 13, 2023) https://thefederalist.com/2023/03/13/newsguard-claims-not-to-be-government-funded-but-a-750k-grant-suggests-otherwise/). But without more, these allegations do not establish that any subsequent action taken by NewsGuard with respect to Plaintiffs was caused by the Government as opposed to NewsGuard's independent conduct. Instead of alleging the necessary facts needed to plead causation, Plaintiffs simply assume that the Government's previous financial award to NewsGuard led to its "blacklisting" of Plaintiffs because "the Government had / has great interest in . . . eradicating COVID / COVID vaccination critics such as Plaintiffs from the public eye." *Webseed*, FAC ¶ 47. Such speculative links fail to establish causation under Article III, particularly for the intervening years since the financial awards.

Plaintiffs make a singular attempt at linking the government to Brighteon by stating that "[d]iscovery in *Missouri v. Biden* revealed Brighteon (at the very least) was being targeted by the Government." *Webseed*, FAC ¶ 92. But in support of this proposition, Plaintiffs include nothing more than two screenshots of district court docket entries that mention Brighteon. *Id.* This passing attempt at alleging specific causation is insufficient. The screenshotted-docket entries seemingly identify mentions of Brighteon in four duplicative *Missouri v. Biden* exhibits of a 2022 report published by the Virality Project – which is not a government entity or defendant in this case. *See Missouri v. Biden*, 3:22-cv-01213 (W.D. La. 2023), Dkt. Nos. 134-6, 137-5, 209-3, 210-24. A handful of mentions of Brighteon in a report by a non-government entity does not, on its own, "reveal[] [that] Brighteon . . . was being targeted by the Government." *Webseed*, FAC ¶ 92. But even if the Court recognized these references to establish a more substantial link between the Government and Brighteon, Plaintiffs fail to establish specific causation sufficient to support standing in this case of the sort required by *Murthy*. Plaintiffs' failure to "line up" their allegations on a Plaintiff-by-Plaintiff, Defendant-by-Defendant, and platform-by-platform basis alone dooms their assertion of causation for purposes of Article III standing. *See Murthy*, 603

United States District Court
Northern District of California

U.S. at 59. On this basis alone, Plaintiffs' claims against the Government Defendants must be dismissed due to lack of standing.

**b. Content moderation and third parties' independent judgment**

Though Plaintiffs lack standing against the Government Defendants based on the preceding analysis, the Court proceeds to address the other aspect of the causation analysis noted in *Murthy* and lacking in the operative pleadings here. The Plaintiffs *Webseed* and *CSOTB*, like the plaintiffs in *Murthy*, fall short of showing any harm is traceable to the Government Defendants rather than the result of the platforms' "independent incentives to moderate content." *Murthy*, 603 U.S. at 60-61. As noted above, a "plaintiff's injury is 'fairly traceable' when there is a 'substantial likelihood' that the defendant's conduct caused the harm." *Baton*, 740 F. Supp. 3d at 878-79 (citation omitted). When "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of someone else" – here, the NGO Defendants and the Platform Defendants – the plaintiff must "adduce facts showing that" the third party's "choices have been or will be made in such manner as to produce causation and permit redressability of" the plaintiff's injury. *Lujan*, 504 U.S. at 562. In other words, a plaintiff suing the government for its actions toward a third party must show that the government's conduct had a "determinative or coercive effect" on the third party's actions, such that the plaintiff's injuries can be regarded as caused by the government and redressable by an injunction of the government's conduct, rather than as caused by "the independent action of" the third party. *Bennett v. Spear*, 520 U.S. 154, 169 (1997) (quotation marks omitted).

The Courts of Appeals repeatedly apply this principle to cases involving alleged government coercion of social media companies to censor online speech. For example, in *Hart v. Facebook, Inc.*, the plaintiff claimed that the government had violated the First Amendment by pressuring Twitter and Facebook into taking certain content-moderation actions against his accounts. *Id.*, 2024 WL 1693355, at *3 (9th Cir. Apr. 19, 2024). The Ninth Circuit affirmed the district court's dismissal of the claims because the plaintiff "ha[d] not plausibly alleged that Twitter and Facebook acted at the behest of the Federal Defendants – as opposed to pursuant to their own policies." *Id.*; *see also id.* (concluding that Hart "ha[d] not shown that the Federal

United States District Court
Northern District of California

Defendants were responsible for Twitter and Facebook's actions" where "[b]oth companies assert[ed] that they moderated Hart's accounts pursuant to their own policies"). The Sixth Circuit reached a similar conclusion in an analogous case. *See Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 497-98 (6th Cir. 2023) (finding no basis in the complaint to believe that "the decisions Twitter made when it enforced its own COVID-19 policy did not result from its 'broad and legitimate discretion' as an independent company" (citation omitted)), *cert. denied*, 144 S. Ct. 2716 (2024). The D.C. Circuit also reached a similar holding on comparable facts in *Ass'n of American Physicians & Surgeons, Inc. v. Schiff*, 23 F.4th 1028 (D.C. Cir. 2022). There, the plaintiff sued a Member of Congress who had written to various technology companies "expressing concern about vaccine-related misinformation on their platforms." *Id.* at 1030. The plaintiff contended that those "inquiries prompted the technology companies to disfavor and deprioritize its vaccine content." *Id.* But the court found the plaintiff's allegations insufficient to establish an Article III controversy with the Member of Congress, explaining that "the technology companies may have taken" disciplinary action against the plaintiff "for any number of reasons unrelated to" the Member's inquiry. *Id.* at 1034.

By contrast, the Ninth Circuit's decision in *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 2715 (2024), involving a similar First Amendment claim against Twitter and a California government official, shows the sorts of facts that can establish traceability. There, the government official had called the plaintiff's post to Twitter's attention such that it was "possible to draw a causal line from the [Government's] flagging of [the plaintiff's] post to [the plaintiff's] suspension from the platform," particularly because "Twitter had never imposed any disciplinary action against him until the" Government "placed his account on the company's radar." *Id.* at 1161-62.

Plaintiffs assert no allegations resembling those in *O'Handley*. Indeed, as explained above, Plaintiffs barely allege any specific instance of Covid-related moderation of their content. *Cf. Murthy*, 603 U.S. at 60-61. Plaintiffs seemingly fail to account for their own acknowledgments that the social-media platforms adopted and implemented their own content-moderation policies. *See, e.g.*, *Webseed*, FAC ¶ 107 (recounting statement from then-Twitter

CEO, Jack Dorsey, "We have a policy against misinformation in three categories, which are manipulated media, public health, specifically COVID, and civic integrity election interference and voter suppression"); *id.* (statement from Google identifying their own policies for disseminating Covid-related news). As Plaintiffs' allegations indicate, the Platform Defendants invoked their own policies to moderate Plaintiffs' content. For instance, Plaintiffs cite an article stating that "Facebook deleted the page for [] Natural News for violating the company's rules about spam," and that according to Facebook, "Natural News was banned for spammy and abusive behavior, not the content they posted," and that "its pages had used abusive audience-building tactics, including posting frequently and trying to evade the company's rate limits." *Id.* ¶ 82 (emphasis & quotation marks omitted) (quoting Rebecca Heilweil, *Technology: Facebook's war against one of the internet's worst conspiracy sites*, VOX (June 25, 2020), link no longer available). Plaintiffs also cite an ISD article stating that Natural News was not only banned from Facebook, Twitter, YouTube, and Google News, but also from Pinterest and Apple. *Id.* ¶ 82 n.56 (citing Institute for Strategic Dialogue, *Anatomy of a Disinformation Empire: Investigating NaturalNews* (2021), at 7, https://www.isdglobal.org/wp-content/uploads/2021/10/20211013-ISDG-NaturalNews-Briefing.pdf). In other words, Natural News' posts were censored across the Internet by allegedly coerced and uncoerced platforms alike. These allegations suggest that Plaintiffs' posts were simply the type of posts that triggered the Platforms Defendants' independent incentives to moderate, undermining the plausibility of Plaintiffs' contentions regarding coerced censorship.

To be sure, at the pleading stage, the Court cannot determine what caused the Platform Defendants' or the third parties' moderation of Plaintiffs' content as a factual matter. The Court may, however, evaluate whether in light of this "obvious alternative explanation" for the content moderation – namely, that it reflected the platforms' own policies – Plaintiffs pleaded a sufficient basis to render "plausible" their proposed inference that the third parties were acting at the government's behest. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007). As the Ninth Circuit has explained, "[w]hen faced with two possible explanations, only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely

United States District Court
Northern District of California

consistent with' their favored explanation but are also consistent with the alternative explanation." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). "Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true . . . in order to render plaintiffs' allegations plausible within the meaning of *Iqbal* and *Twombly*." *Id.* (internal citation omitted). Ultimately, Plaintiffs' allegations are, at best, "stuck in 'neutral territory' " as to whether the Platform Defendants exercised their "own independent judgment" in moderating Plaintiffs' content or were coerced by the Government to do so. *Century Aluminum*, 729 F.3d at 1108 (quoting *Twombly*, 550 U.S. at 557). That is not enough for Plaintiffs to plausibly establish standing to pursue this suit. Plaintiffs' failure to tip their allegations over the edge from possible to plausible warrants dismissal of the claims against the Government Defendants. Plaintiffs' allegations fail even more clearly here when compared to the cases in which plaintiffs failed to sufficiently allege that social media content moderation resulted from government influence rather than independent judgment. *See, e.g.*, *Murthy*, 603 U.S. at 60-61. Plaintiffs' Article III standing fails on this basis as well.

**2. Future Injury**

In addition to failing on the issue of causation, Plaintiffs' claims against the Government Defendants, all of which seek injunctive relief, fail because Plaintiffs fail to plausibly allege future injury that would support such prospective relief. Beyond causation, a plaintiff seeking forward-looking relief must also show "a real and immediate threat of repeated injury." *Murthy*, 603 U.S. at 58 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)). A plaintiff pursuing injunctive relief such as that sought here "must show a substantial risk that, in the near future, at least one platform will restrict the speech of at least one plaintiff in response to the actions of at least one Government defendant." *Murthy*, 603 U.S. at 58. Past injury alone is not sufficient because, "without proof of an ongoing pressure campaign," it would be "entirely speculative that the platforms' future moderation decisions [would] be attributable, even in part, to the defendants," and there would be no basis for injunctive relief. *Id.* at 69. Plaintiffs are therefore required to allege " 'a sufficient likelihood that [they] will again be wronged in a similar way,' " and to do so with concrete specifics rather than " 'mere conjecture' about Defendants' possible actions."

*Wright v. Serv. Emps. Int'l Union Loc. 503*, 48 F.4th 1112, 1118-19 (9th Cir. 2022) (citations omitted). In this context, Plaintiffs must allege "an ongoing pressure campaign" by the Government. *Murthy*, 603 U.S. at 69. Otherwise, it remains "entirely speculative that the platforms' future moderation decisions [would] be attributable, even in part, to the defendants." *Id.*

Here, Plaintiffs' claim for prospective relief falters due to Plaintiffs' own temporally-limited allegations. To seek prospective relief in these cases, Plaintiffs must allege specific facts plausibly establishing that at the time they filed their complaints in May 2024 there was a likelihood of future injury traceable to the Government Defendants. *See O'Shea*, 414 U.S. at 496. But Plaintiffs' allegations regarding the Government Defendants' interactions with third parties focus entirely on the Government's past conduct and policies prior to May 2024. *See, e.g.*, *Webseed*, FAC ¶¶ 64, 69, 71-72, 79, 85. Such past conduct does not show imminent future injury. To the extent Plaintiffs attempt to phrase their claims as current through present verb tense alone, e.g., *id.* ¶ 90 ("[T]here is money flowing from Government agencies to private companies, and Government agencies working with private 'partners' to suppress dissenting domestic speech"), they fail to offer any factual support for ongoing or future conduct. Plaintiffs thus fail to plausibly assert that when they brought this suit "they [were] likely to face a risk of future censorship traceable to the" Government Defendants. *Murthy*, 603 U.S. at 73.

Plaintiffs insist that they have pleaded facts warranting prospective relief. But they make virtually no attempt to allege that, at the time they filed their lawsuit in May 2024, there was "continued pressure" by the Government Defendants on social media platforms to censor Plaintiffs' contents. *Murthy*, 603 U.S. at 73. In the face of this shortcoming, Plaintiffs primarily argue that prospective relief is warranted because platforms continue to suppress Plaintiffs' content based on policies adopted pursuant to the alleged past government coercion. But in *Murthy*, the Court rejected this theory of redressability, holding that without allegations of "continued pressure . . . . the platforms remain free to enforce, or not to enforce, those policies – even those tainted by initial governmental coercion." *Id.* This Court likewise rejects Plaintiffs'

argument and must conclude that Plaintiffs failed to plausibly allege future injury at the hands of the Government Defendants, and lack standing to proceed against them on this basis.

**B. Relief Sought and Redressability**

"Redressability" requires that the relief sought in the lawsuit be able to compensate, or redress, the "injury in fact." *Steel Co. v. Citizens for a Better Environment*, 523 US 83, 107 (1998). Because "no federal court has jurisdiction to enter a judgment unless it provides a remedy that can redress the plaintiff's injury," *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021), the party invoking federal jurisdiction must show that it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision,' " *Lujan*, 504 U.S. at 561.

In the course of clarifying the relief sought in these lawsuits, Plaintiffs state that they "seek declaratory and injunctive relief against the Government and monetary damages against the private Defendants for unlawful conduct already undertaken." *Webseed*, Dkt. No. 150 at 21-22. This clear abandonment of injunctive relief as to the non-government Defendants significantly impacts the redressability analysis.

Relevant here, Plaintiffs could pursue two types of claims for monetary damages for violations of constitutional rights: (1) "*Bivens* claims," so-named following recognition of such a cause of action for monetary relief in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971), and (2) claims brought under Title 42 U.S.C. § 1983. The *Webseed* and *CSOTB* Plaintiffs cannot assert a *Bivens* claim against the non-governmental Defendants for monetary damages based on alleged violations of their First Amendment rights. *See Egbert v. Boule*, 596 U.S. 482, 498-99 (2022) (declining to extend a *Bivens* remedy "to alleged First Amendment violations"). Indeed, Plaintiffs effectively concede they cannot recover under *Bivens*. *Webseed*, Dkt. No. 150 at 43. Plaintiffs can neither recover under Title 42 U.S.C. § 1983, which creates a cause of action against state actors who violate constitutional rights while "acting under color of state law," because there are no Defendants purportedly acting under state law here. *See Hernandez v. Mesa*, 589 U.S. 93, 109 (2020). Plaintiffs' First Amendment claims accordingly lack a cognizable remedy as to the non-governmental Defendants, and Plaintiffs lack

United States District Court
Northern District of California

standing to pursue their First Amendment claims against the non-governmental Defendants because they cannot be redressed by a favorable decision. *See Lujan*, 504 U.S. at 561.

**C. Mootness of Claims against GEC**

The Court briefly discusses mootness because, while related to the doctrine of standing and described by the Supreme Court as "the doctrine of standing set in a time frame," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000), mootness represents a separate legal doctrine with its own exceptions and a distinct application to this case. A case becomes moot when it "los[es] its character as a present, live controversy of the kind that must exist" in order to avoid "advisory opinions on abstract questions of law." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) (citation omitted). The Government Defendants contend the claims against Defendant Global Engagement Center ("GEC") are moot because the GEC was disbanded. *Webseed*, Dkt. No. 160 at 17-19. The Court agrees.

Plaintiffs bring Administrative Procedure Act and ultra vires claims with respect to the GEC's past operations. Specifically, they argue that GEC's operations violated Congress' statutory mandates. *See Webseed*, FAC ¶¶ 227-28 (alleging that the GEC violated Title 22 U.S.C. § 4412 and § 4411, which Plaintiffs claim confined GEC's funding to "counter[ing] 'foreign' propaganda or disinformation"). They also allege that the State Department's expenditures on GEC's alleged operations were unappropriated, which, according to Plaintiffs, renders those past expenditures unconstitutional, *see id.* ¶ 235, and a violation of "the Anti-Deficiency Act's prohibition against federal agencies obligating or expending federal funds outside of, in advance of, or in excess of an appropriation," *id.* ¶ 232; *see also id.* ¶¶ 229-34.

Plaintiffs' challenges to GEC's conduct are moot. All of Plaintiffs' grievances regarding the now-inoperable GEC pertain to its alleged past conduct. *See, e.g.*, *Webseed*, FAC ¶¶ 62-71 (making various allegations regarding GEC's now-terminated Disinfo Cloud). And on December 23, 2024, the GEC's legislative authority was terminated, and its successor, the State Department's Counter Foreign Information Manipulation and Interference ("CFIMI"), was formally closed on April 16, 2025. *See* "Protecting and Championing Free Speech at the State Department," U.S. Dep't of State: Press Statement (Apr. 16, 2025),

https://www.state.gov/protecting-and-championing-free-speech-at-the-state-department. At this juncture, whatever past GEC operations Plaintiffs complain of are no longer ongoing. As such, any ruling on the lawfulness of GEC's prior operations amounts to nothing more than an improper "advisory opinion without the possibility of any judicial relief." *California v. Texas*, 593 U.S. 659, 673 (2021) (citation omitted). The Court must dismiss Plaintiffs' claims regarding the GEC as moot.

Plaintiffs invoke the voluntary-cessation exception to mootness. This argument is futile. To overcome this exception, the government must "show that the practice cannot reasonably be expected to recur." *Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (citation omitted). "A mere physical or theoretical possibility" of reoccurrence is not enough for the claims to survive. *Brach v. Newsom*, 38 F.4th 6, 14 (9th Cir. 2022) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)). Without more, any fears that the government may restart its alleged prior conduct is "too 'remote and speculative' to serve as a firm foundation for [the Court's] jurisdiction." *Brach*, 38 F.4th at 14 (quoting *Lee v. Schmidt-Wenzel*, 766 F.2d 1387, 1390 (9th Cir. 1985)).

Plaintiffs seek an injunction with respect to alleged past conduct by the now-disbanded GEC, which – as evident by the context surrounding its closure – is unlikely to be repeated in the foreseeable future. In announcing the closure of the GEC, the State Department explicitly disavowed its prior operations, stating that "[u]nder the previous administration, [the GEC] . . . actively silence[d] and censor[ed] the voices of Americans they were supposed to be serving," and that its closure was intended to "end[]" those activities and further "preserve and protect the freedom for Americans to exercise their free speech." *See* Protecting and Championing Free Speech. Moreover, the GEC was disbanded over a year ago and Plaintiffs have not alleged any reoccurrence of the alleged misconduct since its closure. These facts cut against the application of the voluntary-cessation exception. *See Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1153 (9th Cir. 2019) (citation omitted) (finding that the challenged conduct "cannot reasonably be expected to recur" in part because the "New Policy unequivocally renounces the previously challenge [policy]," and that "since the New Policy's implementation, defendants

'ha[d] not engaged in conduct similar to that challenged by the plaintiff' " (quoting *Rosebrock v. Mathis*, 745 F.3d 963, 974 (9th Cir. 2014))). These claims are thus moot even if "the Government remains capable of resuming the challenged conduct." *Webseed*, Dkt. No. 148 at 29. The Government has met its burden here to overcome the voluntary cessation exception because the circumstances that led to the disbandment of the GEC demonstrate that the conduct Plaintiffs complain of is unlikely to be repeated in the foreseeable future. The claims are moot and must be dismissed as to GEC with prejudice.

**D. Failure to State a Claim**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, it need not accept legally conclusory statements unsupported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 558-59 (2007) (citations and quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Id.* at 679.

Review is generally limited to the contents of the complaint, although the court can also consider a document on which the complaint relies if the document is central to the claims asserted in the complaint, and no party questions the authenticity of the document. *See Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). The court may also consider matters that are properly the

United States District Court
Northern District of California

subject of judicial notice, *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001), as well as documents referenced extensively in the complaint and documents that form the basis of the plaintiffs' claims. *See No. 84 Emp'r-Teamster Jt. Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 925 n.2 (9th Cir. 2003). If dismissal is warranted, it is generally without prejudice, unless it is clear that the complaint cannot be saved by any amendment. *Sparling v. Daou*, 411 F.3d 1006, 1013 (9th Cir. 2005).

**1. Platform Defendants and Section 230**

The Platform Defendants argue that Plaintiffs' state law claims fail as barred by Section 230 of the Communications Decency Act, Title 47 U.S.C. § 230. Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230(e)(3) gives teeth to this intent by stating unequivocally that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). Importantly, Section 230 bars claims based on a service provider's decisions about "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099 (9th Cir. 2009). Immunity under Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc). "When a plaintiff cannot allege enough facts to overcome Section 230 immunity, a plaintiff's claims should be dismissed." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019); *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265-66 (9th Cir. 2016) (affirming dismissal of claims barred by Section 230). Under Section 230(c)(1), a claim should be dismissed if: (1) the defendant is a "provider . . . of an interactive computer service"; (2) the content at issue was "provided by another information content provider"; and (3) the plaintiff's claim treats the defendant as the "publisher or speaker" of that content. 47 U.S.C. § 230(c)(1).

United States District Court
Northern District of California

Here, Section 230 applies and bars Plaintiffs' state law claims. First, Plaintiffs concede that all three Platform Defendants fall within the definition of an "Interactive Computer Service provider." *Webseed*, FAC ¶ 99 (citing 47 U.S.C. § 230(f)). This satisfies the first element.

Second, Plaintiffs' online posts constitute information provided by another "information content provider." Section 230 defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). The content Plaintiffs posted online (*see Webseed*, FAC ¶ 56) constitutes "information provided by another information content provider" within the meaning of the second prong of the Section 230 analysis because the information did not originate from the Platform Defendants. *Id.* Thus, the second prong of the Section 230 analysis is met. 47 U.S.C. § 230(c)(1).

Third, Plaintiffs' claims seek to treat the Platform Defendants as "publishers." All of Plaintiffs' claims against the Platform Defendants are based on injuries suffered when entities allegedly "remove[d] and reduce[d] (i.e., censor[ed]) Plaintiffs' ability to speak freely, [and] advertise its products . . . through the artificial and unconstitutional restriction of Plaintiffs' access to the digital information market." *Webseed*, FAC ¶ 116; *see also id.* ¶¶ 15, 95-109. Plaintiffs' claims, premised on the removal or restriction of access to their online content, treat the Platform Defendants as publishers because they target "deci[sions] whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102; *see also Roommates.com*, 521 F.3d at 1170-71 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."). In an attempt to avoid the statutory bar, Plaintiffs tack on that "[t]his case is not about treating Big Tech as 'the publisher or speaker' of any third-party information." *Webseed*, FAC ¶ 120. Plaintiffs follow this up in their opposition brief with an attempt to draw a line between claims based on "third-party content," which they concede fall within Section 230's protections, and claims based on a "Platform's own expressive recommendations or restrictions," which they contend do not. *Webseed*, Dkt. No. 130 at 6. That distinction is immaterial. Ninth Circuit precedent has "made clear that removing or restricting postings," as well as recommending third-party content, "fall

United States District Court
Northern District of California

within a publisher's traditional functions." *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 954 (N.D. Cal. 2020), aff'd, 851 F. App'x 723 (9th Cir. 2021); *see also Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019) ("By recommending user groups . . . , [defendant] was acting as a publisher of others' content."); *Barnes*, 570 F.3d at 1105 ("Subsection (c)(1) . . . shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties."); *Roommates.com*, 521 F.3d at 1170-71 ("[A]ny activity that can be boiled down to deciding whether to exclude materials that third parties seek to post online is perforce immune under section 230."); *Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 881 (N.D. Cal. 2022) ("[R]emoval of posts and accounts of a user is generally considered as treating the information content provider as a publisher."). And Plaintiffs do not dispute that the conduct ultimately at issue in each claim is the Platform Defendants' alleged removal, restriction, or other "censorship" of Plaintiffs' content on Google's platforms. *See, e.g.*, *Webseed*, FAC ¶ 2 (alleging attempts to "eradicate . . . Plaintiffs from social media . . . relating to the dissemination . . . COVID information"); *id.* ¶ 8 (Plaintiffs are being "eliminated" from "social media"); *id.* ¶ 107 (describing Google's "prima facie publisher capacity"); *id.* ¶ 158 (Platform Defendants have "downrank[ed] Plaintiffs' journalism"). Under binding precedent, each claim therefore "inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another," and is accordingly barred by Section 230. *Barnes*, 570 F.3d at 1102.

Plaintiffs oppose the Platform Defendants' motions on the premise that the Ninth Circuit and its district courts (including this one) have wrongly interpreted Section 230. *See Webseed*, Dkt. No. 150 at 6-12. Plaintiffs aver that the Ninth Circuit and its district courts wrongfully allow for an immunity that permits dismissal at the pleading stage contrary to the statute's provision of an affirmative defense that should not be resolved until after discovery. *Id.* They argue that Section 230(c)(1)'s purpose is to immunize a publisher's liability only for the substance of third-party content, not the publisher's decisions in moderating that content. *Id.* at 6-10. In so arguing, Plaintiffs effectively concede that binding Ninth Circuit precedent requires dismissal of their claims on Section 230 grounds. *See id.* at 6-12. Moreover, Plaintiffs fail to address, much less distinguish, the abundance of authority finding that Section 230 bars claims at the pleading stage

based on similar facts as those asserted here. *See, e.g.*, *Castronuova v. Meta Platforms, Inc.*, No. 4:24-cv-02523-YGR, 2025 WL 1914860 (N.D. Cal. June 10, 2025) (dismissing claims against social media companies arising from purported censorship); *Brittain v. Twitter, Inc.*, 2019 WL 2423375, *3 (N.D. Cal. June 10, 2019) (dismissing, under Section 230, plaintiff's First Amendment and tort claims because they arose out of Twitter's deletion of the plaintiff's accounts and thus sought "to treat Twitter as a publisher"); *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 955 (N.D. Cal. 2020), aff'd, 851 F. App'x 723 (9th Cir. 2021) (dismissing, under Section 230, plaintiff's First Amendment and tort claims because they sought to hold YouTube liable for censoring and demonetizing plaintiff's videos); *Ebeid v. Facebook, Inc.*, No. 18-CV-07030-PJH, 2019 WL 2059662, at *5 (N.D. Cal. May 9, 2019) ("[D]efendant's decision to remove plaintiff's posts undoubtedly falls under 'publisher' conduct."); *Zimmerman v. Facebook, Inc.*, No. 19-CV-04591-VC, 2020 WL 5877863, at *1 (N.D. Cal. Oct. 2, 2020) ("A social media site's decision to delete or block access to a user's individual profile falls squarely within [Section 230] immunity."). Plaintiffs thus fail to overcome the substantial weight of authority establishing that social media companies like these Platform Defendants cannot be held liable for their publishing decisions, and Plaintiffs fail to establish that Section 230 analysis should be put off until after discovery.

Plaintiffs suggest that a recent opinion from the Ninth Circuit alters this Section 230 analysis. In their notices of withdrawal of motions to retransfer, Plaintiffs quote the opinion, "section 230 merely provides a defense to liability – not immunity from suit," in support of the premise that the Ninth Circuit is no longer "infirm" regarding its interpretation of Section 230. *Webseed*, Dkt. No. 171 (quoting *California v. Meta Platforms, Inc.*, 186 F.4th 663, 670 (9th Cir. 2026)). At the hearing, Plaintiffs argued that this recent authority establishes that Section 230, as an affirmative defense, cannot apply at the pleading stage to release the Platform Defendants from the lawsuit – Section 230 should only be considered as an affirmative defense on the merits following discovery. But Plaintiffs' myopic view of a decision focused on the narrow issue of the propriety of an interlocutory appeal does not alter the preceding analysis. Indeed, the court reaffirmed that Section 230(c)(1) "shields from liability all publication decisions, whether to edit,

to remove, or to post, with respect to content generated entirely by third parties." *California v. Meta*, 186 F.4th at 674. Such a shield from liability runs counter to the faulty assumption underlying Plaintiffs' argument – that an affirmative defense like Section 230 cannot be adjudicated at the pleading stage. Ninth Circuit authority, moreover, provides otherwise. A defendant can seek dismissal at the pleading stage based on an affirmative defense, including through a Rule 12(b)(6) motion, so long as the defense is obvious on the face of the complaint. *See Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013) ("When an affirmative defense is obvious on the face of a complaint, however, a defendant can raise that defense in a motion to dismiss."). Based on the facts alleged and discussed above, the Section 230 defense from liability is obvious from the face of the pleadings. Because Section 230 bars liability for Plaintiffs' state law claims based on Platform Defendants' publishing activity, those claims must face dismissal as to those Defendants with prejudice.

**2. CCDH and Rule 8**

CCDH argues that the Court should dismiss the Complaint as a shotgun pleading because it fails to comply with Federal Rule of Civil Procedure 8(a)'s "short and plain statement" requirement. *See CSOTB*, Dkt. No. 133 at 12. A "shotgun pleading" violates Rule 8 because it fails to provide "sufficient notice" of the claims. *Gibson v. City of Portland*, 165 F.4th 1265, 1288 (9th Cir. 2026) (citations and quotations omitted). The Ninth Circuit recognizes four types of shotgun pleadings:

> (1) a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to be a combination of the entire complaint; (2) a complaint that is replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action; (3) a complaint that fails to separate into a different count each cause of action or claim for relief; and (4) a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.

*Id.* at 1288 (citations omitted).

Here, Plaintiffs' prolix FAC in *CSOTB* represents shotgun pleading in at least three of those four ways. The FAC is replete with conclusory, vague, and immaterial facts not obviously

connected to any cause of action, including multiple paragraphs about findings of fact in unrelated cases, *CSOTB*, FAC ¶¶ 159, 204, 334-354; Communism, the "International Order," and populism, *id.* ¶¶ 74-78; the rise of President Trump, *id.* ¶¶ 124-128; and RFK Jr.'s relationship with the Democratic party and his speech concerning the involvement of the United States in the Russia-Ukraine war, *id.* ¶¶ 160-165, to name a handful. Further, the FAC asserts multiple claims against multiple defendants without clearly identifying "who did what." *Gibson*, 165 F.4th at 1291. Particularly relevant to CCDH, the FAC in *CSOTB* incorporates all 710 paragraphs alleged into each of the asserted counts and groups defendants together by using "the omnibus term 'Defendants.' " *Sollberger v. Wachovia Sec., LLC*, 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010); *see, e.g.*, *CSOTB*, FAC ¶ 717 ("The Defendants have abridged Plaintiffs' right to freedom of press by funding and assisting in the development of, marketing, and/or promoting censorship technologies . . . that are used to censor Plaintiffs' reporting"), ¶ 763 ("This entire Amended Complaint outlines Defendants' conspiracy to censors [sic]"). Plaintiffs' pleading thus fails to provide Defendants notice, but also, it must face dismissal because the pleading represents a "waste [of] scarce judicial resources" and "undermine[s] the public's respect for the courts." *Gibson*, 165 F.4th at 1288 (citations omitted). Plaintiffs protest that the FAC cannot be deemed a shotgun pleading because it is voluminous. *CSOTB*, Dkt. No. 145 at 15. But, as CCDH identifies, "a plaintiff cannot avoid the 'shotgun pleading' rule by simply throwing in everything but the kitchen sink and labeling them as 'facts.' " *CSOTB*, Dkt. No. 157 at 8. Ultimately, the FAC fails because Plaintiffs do not "link their facts to their causes of action." *Gibson*, 165 F.4th at 1291; *see also id.* at 1293 ("Factual allegations, however detailed, must be tied to corresponding causes of action."). The Court therefore GRANTS CCDH's motion to dismiss.

### 3. Treason Claim in *CSOTB*

In *CSOTB*, Plaintiffs advance a claim for "treason" under Title 18 U.S.C. § 2381, a criminal statute. *CSOTB*, FAC ¶¶ 817-22. However, a private right of action does not exist for all injuries caused by violations of the criminal code. *Cent. Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 190 (1994) (noting that courts have been "quite reluctant to infer a private right of action from a criminal prohibition alone."); *see also* 28 U.S.C. § 547(1) (stating that the United

United States District Court
Northern District of California

States Attorney "shall prosecute . . . all offenses against the United States"). Unless "congressional intent can be inferred from the language of the statute, the statutory structure, or some other source," courts do not imply a private remedy for violation of a federal statute. *Thompson v. Thompson*, 484 U.S. 174, 179 (1988).

Here, the Government Defendants primarily argue for dismissal of the treason claim based on the lack of a private right of action for treason. *CSOTB*, Dkt. No. 127 at 30. Plaintiffs point to no statutory basis for the Court to properly infer a private right of action for treason under Title 18 U.S.C. § 2381. Indeed, Plaintiffs do not even oppose the Government Defendants' motion to dismiss this claim. *See generally CSOTB*, Dkt. No. 146. "Courts have previously held that a plaintiff's failure to oppose a defendant's argument was a concession that such claims should be dismissed." *Narang v. Gerber Life Ins. Co.*, No. 18-CV-04500-LHK, 2018 WL 6728004, at *4 (N.D. Cal. Dec. 21, 2018) (collecting cases). In light of both these issues – the lack of a private right of action for treason and Plaintiffs' failure to oppose the Government's motion to dismiss the claim – the Court GRANTS dismissal of the cause of action for treason.

**E. Leave to Amend**

"Generally, Rule 15 advises the court that leave shall be freely given when justice so requires. This policy is to be applied with extreme liberality." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotations and citations omitted). To determine whether leave to amend should be granted, courts consider the following factors: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of the amendment; and (5) whether the party has previously amended the pleadings. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Eminence Cap.*, 316 F.3d at 1051-52. A district court need not permit amendment when it would prove futile – that is, when "no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017) (internal quotation marks and citation omitted).

In sum, certain claims fail as a matter of law, others fail as abandoned, and certain claims remain available for amendment because the Court cannot determine as a matter of law that

United States District Court
Northern District of California

amendment would prove futile. To recap, the Court GRANTS Plaintiffs leave to amend the claims advanced against Government Defendants, excluding GEC, because Plaintiffs may still be able to proffer factual allegations that support standing for those claims. The Court DENIES leave to amend the First Amendment claims against the Platform Defendants and the NGO Defendants because Plaintiffs have abandoned any cognizable form of relief from those private entities. The Court DENIES leave to amend any claims against Defendant GEC because the claims advanced against that disbanded government agency are moot. The Court DENIES leave to amend the state law claims against the Platform Defendants because Section 230 precludes liability against them for their publishing conduct – the substance of the allegations advanced against them. Because there remains a legal possibility that Plaintiffs may be able to allege sufficient facts to state a claim against CCDH, the Court GRANTS leave to amend the remaining state law claims against CCDH in the *CSOTB* case. The Court DENIES leave to amend the treason claim in the *CSOTB* case because the criminal statute does not include a private right of action.

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** all pending motions to dismiss across both cases. The Court grants Plaintiffs leave to file a further amended complaint in both cases, in accordance with the preceding section, by no later than October 28, 2026. No parties or claims may be added without leave of Court or stipulation of all Defendants.

**IT IS SO ORDERED.**

Dated: September 23, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**